DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

SARAH E. GRISWOLD (CABN 240326)
Assistant United States Attorney

    150 Almaden Boulevard, Suite 900
    San Jose, California 95113
    Telephone: (408) 535-5061
    FAX: (408) 535-5081
    sarah.griswold@usdoj.gov

Attorneys for United States of America

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 4:14-cr-94 YGR |
|     Plaintiff, | UNITED STATES'S OPPOSITION TO DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE FROM CUSTODY |
|     v. | |
| CLARENCE LEE ANDREWS, | |
|     Defendant. | |

## <u>TABLE OF CONTENTS</u>

BACKGROUND ..............................................................................................................1

ARGUMENT ...............................................................................................................4

I.      DEFENDANT HAS ADMINISTRATIVELY EXHAUSTED ...........................4

II.     REDUCTION OF DEFENDANT'S SENTENCE IS NOT WARRANTED ...................4

        A.      Applicable law ...............................................................................4

        B.      Defendant has not presented extraordinary and compelling reasons warranting his release ...................................................................10

        C.      This Court may not modify Defendant's sentence because he is a danger to others ...........................................................................14

        D.      Section 3553(a) factors weigh against his release ...........................17

III.    IF THIS COURT MODIFIES DEFENDANT'S SENTENCE, IT SHOULD DO SO WITH APPROPRIATELY RESTRICTIVE CONDITIONS .......................................18

CONCLUSION.............................................................................................................19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **TABLE OF AUTHORITIES**

Cases

*Bonneau v. Salazar,*
  804 F. App'x 717 (9th Cir. 2020) .................................................. 14

*Dillon v. United States*,
  560 U.S. 817 (2010) ............................................................ 6, 7

*Raia,*
  954 F.3d ............................................................................ 9

*Reeb v. Thomas,*
  636 F.3d 1224 (9th Cir. 2011) ...................................................... 13

*Shields,*
  2019 WL 2359231 ................................................................ 14

*Tapia v. United States*,
  564 U.S. 319 (2011) ................................................................ 13

*United States v. Ayon-Nunez*,
  2020 WL 704785 (E.D. Cal. Feb. 12, 2020) .......................................... 9

*United States v. Brooker*,
  976 F.3d 228 (2d Cir. 2020) ...................................................... 6, 7

*United States v. Burrill*,
  445 F. Supp. 3d 22 (N.D. Cal. 2020) ................................................ 7

*United States v. Ceballos*,
  671 F.3d 852 (9th Cir. 2011) ...................................................... 13

*United States v. Chambliss*,
  948 F.3d 691 (5th Cir. 2020) ...................................................... 17

*United States v. Chan,*
  2020 WL 1527895 (N.D. Cal. Mar. 31, 2020) ........................................ 6

*United States v. Daychild*,
  357 F.3d 1082 (9th Cir. 2004) ..................................................... 16

*United States v. Eberhart*,
  448 F. Supp. 3d 1086 (N.D. Cal. 2020) .......................................... 6, 7, 9

*United States v. Greenhut*,
  2020 WL 509385 (C.D. Cal. Jan. 31, 2020) .......................................... 8

*United States v. Harris*,
  No. 18-20343, 2018 WL 3239624 (E.D. Mich. July 3, 2018) ........................... 17

*United States v. Hir*,
  517 F.3d 1081 (9th Cir. 2008) ................................................. 15, 16

*United States v. Mangarella*,
  2020 WL 1291835 (W.D.N.C. Mar. 16, 2020) ......................................... 9

*United States v. Martin*,
  2020 WL 1274857 (D. Md. Mar. 17, 2020) ........................................... 16

*United States v. Pawlowski*,
  967 F.3d 327 (3d Cir. 2020) ...................................................... 17

*United States v. Reynolds*,
  956 F.2d 192 (9th Cir. 1992) ...................................................... 6

*United States v. Rodriguez*,
  2019 WL 6311388 (N.D. Cal. Nov. 25, 2019) ........................................ 6

*United States v. Saldana*,
    807 F. App'x 816 (10th Cir. 2020) ................................................................... 7

*United States v. Shields*,
    2019 WL 2645028, (N.D. Cal. June 27, 2019) .......................................... 6

*United States v. Spencer*, __ F. App'x __, No. 20-3721,
    2020 WL 5498932 (6th Cir. Sept. 2, 2020) ...................................... 18, 19

*United States v. Sprague*,
    135 F.3d 1301 (9th Cir. 1998) ........................................................................ 8

*United States v. Torres*,
    911 F.3d 1253 (9th Cir. 2019) ...................................................................... 16

*United States v. Washington*,
    2020 WL 1969301 (W.D.N.Y. Apr. 24, 2020) ........................................... 9

*United States v. Weidenhamer*,
    2019 WL 6050264 (D. Ariz. Nov. 8, 2019) ................................................ 9

*United States v. Willingham*,
    2019 WL 6733028 (S.D. Ga. Dec. 10 .......................................................... 6

## Statutes

18 U.S.C. § 1951(a) ................................................................................................... 1

18 U.S.C. § 3142(g) ................................................................................. 3, 14, 15

18 U.S.C. § 3553(a) ............................................................................................... 18

18 U.S.C. § 3582(c) ................................................................................... passim

18 U.S.C. § 3624(c) ....................................................................................... 13, 14

18 U.S.C. § 3621(b) ............................................................................................... 14

28 U.S.C. § 994(t) .................................................................................... 4, 15

Pub. L. No. 116-136 ............................................................................................. 13

Pub. L. No. 115-391 ................................................................................................. 5

## U.S. Sentencing Guidelines

USSG § 1B1.13 ............................................................................................. passim

USSG § 5F1.2 ........................................................................................................ 20

Defendant Clarence Lee Andrews is currently serving a 210-month sentence for his conviction of conspiracy to commit robbery affecting interstate commerce, at USP Lompoc, with an anticipated release date of January 23, 2029. He seeks relief pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) or home confinement. (Dkt. 81.) The government opposes Defendant's motion.

## BACKGROUND

Defendant was charged with conspiring to commit robbery beginning on or before February 18, 2013, and continuing through at least on or about January 29, 2014, in violation of 18 U.S.C. § 1951(a). (Dkt. 9.) He was detained pretrial as a danger to the community. (Dkts. 5, 63.)

On March 14, 2014, Defendant was convicted by open plea of conspiracy to commit robbery affecting interstate commerce (Count 1). (Dkt. 19, 67.) Defendant admitted to his direct involvement in four robberies and one attempted robbery, the "total number of robberies that occurred" during the course of the conspiracy was "closer to thirty." (Revised Presentence Investigation Report ("PSR") ¶ 19.)

### 1. February 18, 2013, jewelry store robbery

First, Defendant admitted to conspiring to commit and participating in the February 18, 2013, robbery of the New York Diamond Jewelry Store in Manteca, California. (Dkt. 67 at 32.) Defendant took the stolen jewelry and sold it to a third party. (*Id.*; PSR ¶ 11.) Two individuals entered the store with semiautomatic handguns, ordered two store employees to the ground, restrained them with zip-ties, and wrested a firearm from a third store employee. (PSR ¶ 10.) A third individual then entered the store with a sledgehammer and began breaking the glass containing wedding rings. (PSR ¶ 10.)

### 2. June 10, 2013, Craigslist luxury watch robbery

Second, Defendant admitted to conspiring to commit and participating in the June 10, 2013, robbery of a person trying to sell his Rolex watch through Craigslist. (Dkt. 67 at 32; PSR ¶ 12.) The victim was induced to fly into Oakland, California to sell the watch. (Dkt. 67 at 32.) Co-conspirators met the victim at a Wells Fargo bank, where one of the co-conspirators ran off with the watch. (*Id.*) When a witness tried to tackle the person who had run off with the watch, Defendant attacked that witness, causing minor cuts and bleeding to the witness, to assist his co-conspirator's escape. (*Id.*; PSR ¶¶ 12-13.)

*3. July 3, 2013, Craigslist diamond robbery*

Third, Defendant admitted to conspiring to commit and participating in the July 3, 2013, robbery of an individual from Southern California who had advertised diamonds for sale on Craigslist. (Dkt. 67 at 33; PSR ¶¶ 14-15.) The Craigslist seller was induced to fly into Oakland, California to sell two diamonds. (Dkt. 67 at 33; PSR ¶ 14.) Defendant posed as a limousine driver and drove the seller from the airport to a church in El Cerrito to be robbed by co-conspirators of the diamonds. (Dkt. 67 at 23-25, 33-35.) During the robbery, the victim was pistol-whipped on the head, causing him to bleed, for which responding paramedics recommended hospital treatment. (Dkr. 67 at 33-34; PSR ¶ 14.) The victim was pulled out of the limousine, robbed of his diamonds, luxury watch, passport, and wallet, and abandoned. (PSR ¶ 14.) The victim's stolen credit cards were used fraudulently. (PSR ¶ 14.)

*4. July 11, 2013, Craigslist diamond robbery*

Fourth, Defendant admitted to conspiring to commit and participating in the July 11, 2013, robbery of another Craigslist diamond seller. (Dkt. 67 at 34; PSR ¶¶ 16-17.) Defendant posed as a limousine driver and drove the female seller from the Oakland airport to which she had flown to a location in Contra Costa County where co-conspirators used a silver handgun to rob the victim of the diamond she had posted for sale on Craigslist, as well as other items, before abandoning her near a small field. (Dkt. 67 at 23-25, 34-35; PSR ¶ 16.) The victim, who was "visibly upset," was stranded for forty-five minutes, until she was able to flag down police officers passing by on patrol. (PSR ¶ 16.)

*5. December 16, 2013, Craigslist watch robbery*

Fifth, Defendant admitted to conspiring to commit and participating in the December 16, 2013, robbery of a Craigslist watch seller (who was actually an undercover law enforcement officer), who had been induced to fly into Oakland airport. (Dkt. 67 at 35; PSR ¶ 18.) A co-conspirator rented the limousine used to transport the target victim, and another co-conspirator posed as a limousine driver to pick up the victim. (Dkt. 67 at 35.) At the time law enforcement agents disrupted the conspiracy, Defendant was on the phone with a co-conspirator who acted as limousine driver. (Dkt. 67 at 35-36.)

On December 18, 2014, this Court sentenced Defendant to 210 months in prison and 3 years of supervised release. Probation determined that Defendant is a career offender because "[D]efendant is over the age of 18, was found guilty of a crime of violence and has two past convictions for crimes of

violence (Robbery 2nd degree Docket No. VC44856 and Robbery 2nd Degree, Docket No. SF105132A)." (PSR ¶ 67. This Court agreed. (Dkt. 66 at 3-4) This Court indicated that its initial view of the case was that Andrews merited a high-end or above-guidelines sentence because his offense was a "high-level offense." (Dkt. 66 at 5-6, 8.) This Court noted that the case as involved "over 30 robberies, numerous victims, people who had guns put to their heads, people who were hurt, people who were lured into robbery situations, premeditation, picked up at the airport in limousines or other cars, and then assaulted." (Dkt. 66 at 4.)

This Court focused on the violence perpetrated during the robberies, the number of robberies ("thirty"), and that the crimes were premeditated, noting that it had "just sentenced someone to 180 months who didn't have any violent background." (Dkt. 66 at 6-7.) This Court further notes that "[t]wo young men who never had a criminal background were convinced by [Defendant] to get involved" and were now "serving significant prison sentences." (Dkt. 66 at 6.) This Court observed that Defendant's conduct was particularly indefensible because he had earned nearly $44 an hour in environmental remediation after completing a training program subsequent to his release from incarceration for a grand theft felony. (Dkt. 66 at 6; PSR ¶¶ 78, 10, 114; PSR Sentencing Recommendation at 2.)

Defendant had been "given incredible opportunities" after experiencing incarceration – "a stable job," "a loving wife and a young family," but "that wasn't enough" for him and he was compelled to "terrorize" "30 people." (Dkt. 66 at 6-7.) This Court was concerned, too, that given Defendant's "background," "actions," and "choices," he would continue to hurt people unless incarcerated for a lengthy period of time. (Dkt. 66 at 8.)

Defendant is presently serving his sentence at USP Lompoc in California, with a projected release date of January 23, 2029. http:bop.gov/inmateloc.

On April 24, 2017, the Ninth Circuit affirmed Defendant's 210-month sentence. (Case No. 15-10030 (9th Cir.) Dkt. 82-1.) The Ninth Circuit vacated the restitution order and remanded for minor correction of the restitution amount. On August 15, 2017, this Court issued an Amended Judgment reducing the restitution order by ten cents. (Dkt. 78.)

Defendant is presently 46 years old. The PSR noted that Defendant reported some pain during cold weather as a result of a shot to the leg and two root canals that needed to be finished. (PSR ¶ 103.) Defendant reported no other health conditions. (Dkt. 39 (PSR).)

On June 26, 2020, the Warden received Defendant's request for compassionate release due to the COVID-19 pandemic. (Dkt. 81-2.) On July 24, 2020, the Warden denied Defendant's request. (*Id.*) The Bureau of Prisons (BOP) noted that Defendant "do[es] not meet the criteria to be considered for a Compassionate Release/[Reduction in Sentence], and no extraordinary or compelling circumstances were provided." (*Id.*)

ARGUMENT

## I.  DEFENDANT HAS ADMINISTRATIVELY EXHAUSTED

Because Defendant has exhausted the statutory prerequisites for seeking judicial relief, this Court may consider Defendant's motion. Defendant submitted a letter dated June 25, 2020, to the Warden at USP Lompoc requesting his compassionate release. (Dkt. 81-2.) Thirty days have lapsed since the date of his submission; thus this Court may review Defendant's motion on the merits. *See* 18 U.S.C. § 3582(c)(1)(A).

## II.  REDUCTION OF DEFENDANT'S SENTENCE IS NOT WARRANTED

Although the COVID-19 pandemic is an extraordinary world event, Defendant has failed to show that that its impact on him, specifically, warrants his immediate release pursuant to 18 U.S.C. § 3582(c)(1)(A) because he is not suffering from a medical condition that the CDC has identified as particularly at risk for severe symptoms if he were to contract COVID-19, he presents a danger to the community, and re-balancing the Section 3553(a) factors does not indicate the defendant should be released immediately as he/she seeks.

### A.  Applicable law

This Court may only reduce a sentence pursuant to 18 U.S.C. § 3582(c)(1)(A) if, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," the Court "finds that" either "extraordinary and compelling reasons warrant such a reduction," or the defendant is at least 70 years old and has served at least 30 years in prison, "and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." *See, e.g.*, *United States v.*

*Reid*, No. 17-cr-00175-CRB-1, Dkt. 554 (N.D. Cal. May 5, 2020); *United States v. Robinson*, No. 18-CR-00597 RS, Dkt. 33 (N.D. Cal. Apr. 27, 2020).

The pertinent policy statement is set forth at United States Sentencing Guidelines (USSG) § 1B1.13. It prohibits this Court from reducing a defendant's sentence unless the Court determines that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." *See United States v. Cazarez*, No. 15-CR-00362-CRB-1, Dkt. 78 (N.D. Cal. May 4, 2020) (denying compassionate release claim due to danger).

The Sentencing Commission also provided explicit examples of what constitutes an "extraordinary and compelling circumstance":

(A) **Medical Condition of the Defendant.**—

    (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

    (ii) The defendant is—

        (I) suffering from a serious physical or medical condition,

        (II) suffering from a serious functional or cognitive impairment, or

        (III) experiencing deteriorating physical or mental health because of the aging process,

    that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B) **Age of the Defendant** — The Defendant is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the ageing process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment; whichever is less.

(C) **Family Circumstances.** —

    (i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.

    (ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or the registered partner.

USSG § 1B1.13 cmt. n.1.

USSG § 1B1.13 is binding on district court's discretion in determining whether the defendant has presented an extraordinary and compelling reason for early release. Any reduction in a defendant's sentence under 18 U.S.C. § 3582(c)(1)(A) must be "consistent with applicable policy statements issued by the Sentencing Commission," which are included in USSG § 1B1.13. The Supreme Court analyzed an identical statutory requirement in § 3582(c)(2) and held that the relevant USSG policy statement is binding, not advisory. *Dillon v. United States*, 560 U.S. 817, 819, 825–28, 830 (2010). The same logic applies here.[1] While some courts have held that the First Step Act of 2018 altered the binding nature of USSG § 1B1.13, which has not been updated since the Act's passage to reflect that defendants can file their own motions after exhausting administrative remedies, the First Step Act did not alter the key language that the Supreme Court found determinative and binding with respect to subpart (c)(2) in *Dillon*. First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194 (effective December 21, 2018). The Second Circuit recently held that USSG § 1B1.13 is out of step with Congress' intent shown by passing the First Step Act and thus does not apply to motions made by defendants rather than the Director of BOP. *United States v. Brooker*, 976 F.3d 228, 234–37 (2d Cir. 2020).[2]

This Court should reject the Second Circuit's position, which is inconsistent with *Dillon*—precedent which *Brooker* fails entirely to address. *See Brooker*, 976 F.3d at 234–38. This Court should instead join the other courts that have found USSG § 1B1.13 to remain binding, and hold that the policy statement constrains courts in all motions brought under 18 U.S.C. § 3582(c)(1)(A), not just those

---

[1] As the Court found in *Dillon*, here Congress explicitly gave authority to the Sentencing Commission to further describe what conduct would authorize a court to order a compassionate release. Specifically, 28 U.S.C. § 994(t) states that the Sentencing Commission "shall describe what should be considered extraordinary and compelling reasons for sentence reduction" under § 3582(c)(1)(A), "including the criteria to be applied and a list of specific examples." The statute also states that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t).

[2] District courts across the country are divided over this question, including in this district. *Compare United States v. Rodriguez*, 2019 WL 6311388, at *7 (N.D. Cal. Nov. 25, 2019) (holding that because the policy statement has not been revised since the First Step Act was enacted, district courts are free to consider circumstances beyond those enumerated in USSG § 1B1.13), *and United States v. Chan,* 2020 WL 1527895, at *8 (N.D. Cal. Mar. 31, 2020) (same), *with United States v. Flores*, 17-CR-00373-CRB-2, ECF No. 85 at 3 (N.D. Cal. Sept. 21, 2020) (holding USSG § 1B1.13 is still binding and citing *Dillon*), *United States v. Eberhart*, 448 F. Supp. 3d 1086, 1090 (N.D. Cal. 2020) (same), *and United States v. Shields*, 2019 WL 2645028, (N.D. Cal. June 27, 2019). *See also United States v. Willingham*, 2019 WL 6733028, at *2 (S.D. Ga. Dec. 10, 2019) (collecting district court cases finding USSG § 1B1.13 to be binding, and those finding it not to be).

brought by the Director of BOP.  *See*, *e.g.*, *United States v. Saldana*, 807 F. App'x 816, 820 (10th Cir. 2020) (dismissing motion for lack of jurisdiction where defendant's motion did not claim a reason identified within USSG § 1B1.13).  Following the logic of the Second Circuit's opinion means a defendant could bring a request to BOP that BOP is required to deny under USSG § 1B1.13, but which the district court could then review without any similar limitation.  This would run counter to Congress' intent "to authorize only a limited adjustment to an otherwise final sentence." *Dillon*, 560 U.S. at 826.

Notably, the First Step Act did not change the factors relevant to whether and how the courts should modify a defendant's sentence, only the procedures by which a defendant can raise such claims. Congress could have updated the substantive requirements for § 3582(c)(1)(A) motions, but it did not do so.  Rather, Congress altered only procedurally who could bring a motion under § 3582(c)(1)(A) to the district court, and, indeed, titled the portion of the First Step Act "Increasing the Use and Transparency of Compassionate Release." *Brooker*, 976 F.3d at 233 (citing P.L. 115-391 § 603(b), 132 Stat. 5194, 5239).  But increasing the use of the procedural vehicle, the transparency of the decision-making process, and the speed with which a defendant receives an answer does not implicate *the criteria* courts should use for determining if early release is appropriate.  Congress left the requirements for eligibility untouched by the First Step Act and still squarely within the Sentencing Commission's hands.

The best way to align with *Dillon*, preserve the language of USSG § 1B1.13, and remain consistent with Congressional intent, is not to disregard the policy statement entirely when a defendant brings a compassionate release motion, as the Second Circuit held in *Brooker*, 976 F.3d at 234–37, but to continue to use the policy statement to define the criteria for defendants to be eligible for early release *whether BOP or the defendant makes the motion* for sentence reduction.  At the very least, even courts who "have found the provision to be outdated have held it continues to provide 'helpful guidance.'" *United States v. Burrill*, 445 F. Supp. 3d 22, 24–25 n.2 (N.D. Cal. 2020) (citation omitted).  Continuing to follow the listed reasons in USSG § 1B1.13 also furthers the policy of keeping "statutory exceptions to the general rule of finality of judgment" limited.  *Eberhart*, 448 F. Supp. 3d at 1090 (citing *Dillon* and holding USSG § 1B1.13 is still binding).

Thus, in order to qualify for compassionate release after having exhausted his or her administrative remedies with the Bureau of Prisons, a defendant must be able to demonstrate one of the

listed reasons in (A)–(C) above. *See United States v. Kelley*, 15-cr-00444-CRB-2, Dkt. 146 (N.D. Cal. May 27, 2020). The "catch-all" in USSG § 1B1.13 application note 1(D) should be read in the manner of maintaining some administrative discretion within BOP to determine if there are additional reasons, beyond what is strictly described in (A)–(C) but within the same type of considerations (*e.g.*, deteriorating mental or physical health, exigent family circumstances, or medical conditions which diminish an inmate's ability to provide self-care in prison).[3] In this case, the Director of BOP did not identify any "extraordinary and compelling reason" under Application Note 1(D), which is thus inapplicable to this situation. *See United States v. House*, No. 14-cr-00196-CRB-1, Dkt. 2202 at 4 n.2 (N.D. Cal. May 20, 2020) (holding (D) inapplicable even in light of the COVID-19 pandemic). Changes in sentencing law do not fall under any of the categories listed in USSG § 1B1.13.

Defendant bears the burden to show special circumstances meeting the high bar set by Congress and the Sentencing Commission for compassionate release to be granted. *See United States v. Shabudin*, No. 11-CR-00664-JSW-1, Dkt. 571 (N.D. Cal. May 12, 2020); *United States v. Greenhut*, 2020 WL 509385, at *1 (C.D. Cal. Jan. 31, 2020) (holding that defendant bears the burden of establishing entitlement to sentencing reduction and citing *United States v. Sprague*, 135 F.3d 1301, 1306-07 (9th Cir. 1998)).

For that reason, to state a cognizable basis for a sentence reduction based on a medical condition, Defendant first must establish that his condition falls within one of the categories listed in the policy statement. Those categories include, as particularly relevant here, (i) any terminal illness, and (ii) any "serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." USSG § 1B1.13 cmt. n.1(A). If a defendant's medical condition does not fall within one of the categories specified in the application note (and no other part of the application note applies), his or her motion must be denied.

---

[3] Indeed, BOP promulgated Program Statement 5050.50, amended effective January 17, 2019, to set forth its own internal criteria for evaluating compassionate release requests. *See* https://www.bop.gov/policy/progstat/5050_050_EN.pdf.

The existence of the COVID-19 pandemic, which poses a general threat to every non-immune person in the country, does not by itself fall into either of those categories and therefore could not alone provide a basis for a sentence reduction.[4]  As Chief Judge Hamilton recently held in this district, "General concerns about possible exposure to COVID-19 do not meet the criteria for extraordinary and compelling reasons for a reduction in sentence set forth in the Sentencing Commission's policy statement on compassionate release, U.S.S.G. §1B1.13." *Eberhart*, 448 F. Supp. 3d at 1090; *see also Raia*, 954 F.3d at 597 ("[T]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread.").  The categories encompass specific serious medical conditions afflicting an individual inmate, not generalized threats to the entire population.

Nor would a defendant's chronic but manageable underlying medical condition, alone, constitute "extraordinary and compelling" circumstances.  *See United States v. Arceo*, No. 09-CR-00616-EJD-1, Dkt. 86 (N.D. Cal. May 22, 2020) ("[T]he mere fact that Defendant suffers from chronic conditions is insufficient [for compassionate release].").  Indeed, before the outbreak of COVID-19, district courts addressing § 3582(c)(1)(A) claims routinely noted:  "To be faithful to the statutory language requiring 'extraordinary and compelling reasons,' it is not enough that Defendant suffers from . . . chronic conditions that [he] is not expected to recover from.  Chronic conditions that can be managed in prison are not a sufficient basis for compassionate release."  *United States v. Ayon-Nunez*, 2020 WL 704785, at *2–3 (E.D. Cal. Feb. 12, 2020) (rejecting a claim for compassionate release from a defendant suffering from severe back injuries and epilepsy) (quoting *United States v. Weidenhamer*, 2019 WL 6050264, at *5 (D. Ariz. Nov. 8, 2019)).  Compassionate release is "rare" and "extraordinary" and courts routinely deny such claims.  *See Arceo*, No. 09-CR-00616-EJD-1, Dkt. 86 (noting compassionate release is rare); *United States v. Mangarella*, 2020 WL 1291835, at *2–3 (W.D.N.C. Mar. 16, 2020) ("[A] compassionate release . . . is an extraordinary and rare event." (citation omitted)).

---

[4]  Indeed, it is reported that some inmates are *trying* to contract COVID-19 in the hopes that it will enable them to get released from prison. *See* https://www.washingtonpost.com/nation/2020/05/12/inmates-coronavirus-infect-los-angeles/ (inmates in LA county jail have attempted to infect themselves with COVID-19 in order to be released).

But the combination of an inmate's chronic medical condition and the risk of contracting COVID-19 in a custodial setting may constitute an extraordinary and compelling reason to grant a motion under 18 U.S.C. § 3582(c)(1)(A), where COVID-19 and an inmate's medical condition would not individually suffice. If an inmate has a chronic medical condition that has been identified by the CDC as elevating the inmate's risk of becoming seriously ill from COVID-19,[5] that condition—in combination with the likelihood that a defendant may contract COVID-19 while incarcerated and suffer severe symptoms as a result—may constitute a "serious" medical condition "from which [the defendant] is not expected to recover," which "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility." USSG § 1B1.13 cmt. n.1(A)(ii)(I). But as part of its analysis of the totality of circumstances, the Court should also consider whether the inmate is more likely to contract COVID-19 if he or she is released than if he or she remains incarcerated. That will typically depend on the inmate's proposed release plans and whether a known outbreak has occurred at his or her institution.

### B. Defendant has not presented extraordinary and compelling reasons warranting his release

Defendant has not demonstrated that he has the sort of medical condition that places him on the CDC list of at-risk individuals who may suffer severe symptoms if they contract COVID-19. While Defendant identifies a number of underlying health conditions, each condition appears from his BOP medical records to be under control, resolved, or non-existent.

The only condition Defendant identifies which he currently has is prediabetes. (Ex. 1 at 5.) The CDC, however, does not identify this as a condition that does or may increase one's risk.

While CDC guidance identifies chronic kidney disease as a condition that increases one's risk of severe illness from COVD-19, Defendant does not have this condition. The medical records he cites are from 2018 and reflect stage 2 (mild) chronic kidney disease. (Mot. at 3, 4, Dec. L at 262, 287, 305.) However, as of December 21, 2020, this condition has resolved. (Ex. 1 at 6.)

---

[5] *See* Centers for Disease Control, *At Risk for Severe Illness*, *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last modified Dec. 29, 2020).

CDC guidance identifies hypertension as a condition that might increase one's risk for a severe illness from COVID-19. Defendant contends he may have once had hypertension, (Mot. at 3), and points to a medical record that reflects a normal chest exam in August 2019 (Mot. at 3 n.12, Ex. L at 259). He concedes that "other medical records state that [Defendant] does not have a history of hypertension," (Mot. at 3 n. 12), including a June 2020 record which states he has no such history (Ex. L at 157).

The CDC does not recognize the remaining conditions Defendant identifies, and does not have, as increasing or potentially increasing one's risk of a severe illness from COVID-19. Defendant's medical records indicate a past cardiac arrhythmia, which has been in remission since December 19, 2018. (Ex. 1 at [page 5].) Defendant's medical records also indicate that the testicular lump of which he complained was resolved as of December 21, 2020. (Ex. 1 at 6.) Similarly, Defendant noted chest pain as of July 2020, (Mot. at 5), but his ECG results were normal in August 2020 (Ex. 1 at 1-2).

Thus, it appears to the government that Defendant is not particularly at a higher risk of severe illness or death from COVID-19 according to CDC guidance and, as a result, Defendant does not meet any of the listed reasons in USSG § 1B1.13 Application Note 1.

Furthermore, BOP has taken significant measures to protect the health of inmates in its charge. BOP has had a Pandemic Influenza Plan in place since 2012. BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy and detailed, establishing a six-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." *Id*. at i. The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates. The Action Plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters for a period of at least 14 days, in order to stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions of the disease. Likewise, all official staff travel has

1  been cancelled, as has most staff training.  All staff and inmates have been and will continue to be issued

2  face masks and strongly encouraged to wear an appropriate face covering when in public areas when

3  social distancing cannot be achieved.

4  The Action Plan comprises of several additional preventive and mitigation measures, including

5  suspension of social visitation, internal inmate movements, legal visits, official staff travel, training,

6  access by volunteers and many contractors; extensive screening of staff and inmates (including

7  screening of all new inmates); quarantine; and modified operations to maximize social distancing as

8  much as practicable.  *See* Federal Bureau of Prisons, BOP Implementing Modified Operations, *available*

9  *at* https://www.bop.gov/coronavirus/covid19_status.jsp (last accessed March 23, 2020).  All new BOP

10  inmates are screened for COVID-19 symptoms and risk of exposure.  Asymptomatic inmates with a

11  documented risk of exposure will be quarantined; symptomatic inmates with documented risk of

12  exposure will be isolated and tested pursuant to local health authority protocols.  In areas with sustained

13  community transmission, all facility staff will be screened for self-reported risk factors and elevated

14  temperatures.

15  As of May 18, 2020, all newly admitted inmates to any BOP detention center, jail, and institution

16  will be tested at a quarantine site for COVID-19, in addition to screening them for COVID-19 symptoms

17  and a temperature check, before they enter their designated BOP facility.[6]  The testing will be conducted

18  either using Abbott instruments on-site or through commercial lab contracts.  Inmates who test positive

19  or have symptoms consistent with COVID-19 will be placed in isolation, even if asymptomatic, until

20  they meet the current CDC release-from-isolation criteria.  COVID-19 negative inmates will be placed

21  in quarantine for 14 days and have twice daily symptom screening and temperature checks.  If they

22  develop COVID-19 symptoms during the 14 days, they will be retested for COVID-19 and placed in

23  isolation.  At the end of the 14-day quarantine, an inmate will be retested for COVID-19.  If the test is

24  negative, the inmate will be deemed appropriate to transfer from the quarantine site to their designated

25  institution.  Both inmates and staff are required to wear face masks during any transfer that occurs.

26

27

28  _____
    [6] *See* Federal Bureau of Prisons, BOP Announces Update on Inmate Movement, *available at*
    https://www.bop.gov/resources/news/pdfs/20200527_press_release_inmate_movement.pdf.

Additionally, in light of the global pandemic, the BOP has been given expanded authority to review inmates who are potentially vulnerable to COVID-19 earlier in their sentences for transfer from a secure facility to home confinement. The Attorney General has directed the Director of the BOP to prioritize granting home confinement to eligible inmates who are especially vulnerable to COVID-19 based on their age and underlying health conditions as identified by the Centers for Disease Control and Prevention ("CDC"), where home confinement would be more effective in protecting their health, and not present a great risk to public safety. Att'y Gen. Memo. (Mar. 26, 2020). The Attorney General has also invoked his emergency authority to "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2)." Coronavirus Aid, Relief, and Economic Security Act (CARES Act), Pub. L. No. 116-136, 134 Stat. 281, § 12003(b)(2) (March 27, 2020). As a result, BOP is broadly evaluating inmates for placement in home confinement according to internal guidelines, with priority given to those most vulnerable to COVID-19 and those at facilities most affected by COVID-19. Att'y Gen. Memo. (April 3, 2020); *see also* BOP Memo. (May 8, 2020) (providing updated guidance allowing for consideration for home confinement of inmates with minor disciplinary issues within the past twelve months).

Pursuant to the Attorney General's directive, BOP is urgently assessing the inmate population for home confinement. To date, BOP has transferred 21,067 inmates to home confinement since March 26, 2020, and BOP continues to aggressively screen all potential inmates for eligibility, without any need by the inmate to apply for consideration. *See* COVID-19 Home Confinement Information, https://www.bop.gov/coronavirus/ (updated every day at 3:00 p.m. EST).[7]

---

[7] The government notes, and the Court is likely aware, that BOP has exclusive authority to determine the location where an inmate serves his or her custodial sentence, including whether transfer from a secure facility to home confinement under 18 U.S.C. § 3624(c) is more appropriate for a particular defendant. *See United States v. Ceballos*, 671 F.3d 852, 855 (9th Cir. 2011) (per curiam) ("The Bureau of Prisons has the statutory authority to choose the locations where prisoners serve their sentence."); *Reeb v. Thomas*, 636 F.3d 1224, 1226 (9th Cir. 2011) ("Congress delegated to the BOP the duty to manage and regulate all federal penal and correctional institutions."); *see also Bonneau v. Salazar*, 804 F. App'x 717, 718 (9th Cir. 2020) (holding home confinement is a decision that is solely within the province of the BOP); *see also Tapia v. United States*, 564 U.S. 319, 331 (2011) ("When a court sentences a federal offender, the BOP has plenary control, subject to statutory constraints, over [the place of imprisonment and treatment programs].").  Although this Court may make a non-binding recommendation to BOP as to home confinement, BOP's designation decision "is not reviewable by any court." 18 U.S.C. §§ 3621(b) & 3624(c); *see, e.g., United States v. Kim*, No. 17-CR-00355-YGR-1, Dkt. 96 (N.D. Cal. May 1, 2020) (denying defendant's motion for compassionate release but recommending BOP place defendant in home confinement); *United States v. Jones*, No. CR 17-070 VC, Dkt. 93 (N.D. Cal. Apr.

Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

Defendant is serving his sentence at USP Lompoc. As of January 29, 2021, one inmate and six staff are currently positive for COVID-19, and two inmates have died from COVID-19. https://www.bop.gov/coronavirus/.

Defendant, likewise, has no exigent family circumstances. *See Shields*, 2019 WL 2359231, at *5 (denying claim for release to care for daughter with epilepsy where defendant's partner worked full-time in part because "if this Court were to conclude that [the daughter's] circumstances warrant a reduction in [defendant's] term of imprisonment, the same could be said of *any* inmate who has young children and a spouse who must work" (original emphasis)).

### C. This Court may not modify Defendant's sentence because he is a danger to others

This Court may not reduce Defendant's sentence unless it finds that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." USSG § 1B1.13(2). *See Cazarez*, No. 15-CR-00362-CRB-1, Dkt. 78 (denying compassionate release claim due to danger). This record precludes such a finding.

Defendant's argument is that given his age, health, and good conduct in prison, this Court should conclude he no longer presents a danger or that any potential danger is outweighed by the risk he will contract COVID-19. But many defendants do well in prison only to revert to crime upon their release, and many elderly defendants have years of good conduct in prison but may remain dangerous to the community. The standard for compassionate release is not just whether someone is elderly and has performed well in prison. *See* USSG § 1B1.13 app. note 3 ("Pursuant to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement."). Defendant must also show that he will not be a danger if released. He cannot do so. *See United Sates v. Cazares*, No. 18-cr-00466-BLF-1, Dkt. 351 (N.D. Cal. Apr. 23, 2020) (concluding, in the pre-trial detention context, that "the balancing of the factors does not warrant [defendant's] release [because he] continues to pose a serious risk to the safety of the community, and

10, 2020) (same); *United States v. Fobbs*, No. 19-CR-410 WHA, Dkt. 32 (N.D. Cal. Apr. 7, 2020) (recommending BOP place defendant in home confinement).

that risk overrides [defendant's] concerns that he might contract COVID-19 at [local jail].").

Recognizing that there is a significant difference between doing well in prison and doing well in society, this Court must look to the factors set forth in 18 U.S.C. § 3142(g).

Under § 3142(g), the Court must consider four factors in determining whether the defendant might present a danger: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including the defendant's character, physical and mental condition, family and community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court, and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. 18 U.S.C. § 3142(g)(1)–(4). Consideration of these factors—which are not affected by COVID-19—does not allow this Court to conclude that Defendant is not a danger to the safety of any other person or the community.

The offense of conviction is a crime of violence. The conspiracy involved armed robberies that physically and/or emotionally injured dozens of victims. The weight of the evidence, including the extended period of violent robberies, clearly and convincingly established a likelihood that the defendant would pose a danger if released. *See United States v. Hir*, 517 F.3d 1081, 1090 (9th Cir. 2008). Defendant's has a history that includes six failures to appear and five probation revocations, (Dkt. 63 at 11, PSR ¶¶ 76, 77), as well as two prior convictions for crimes of violence ( PSR ¶ 67). Defendant committed the instant offense when he was 38 to 39 years old. He did so despite having a good-paying job in environmental remediation. (Dkt. 66 at 6; PSR ¶¶ 78, 10, 114; PSR Sentencing Recommendation at 2.) He convinced two younger men without criminal records to join in the instant offense. (Dkt. 66 at 6.)

As this Court recognized at Defendant's sentencing, Defendant was "given incredible opportunities" after experiencing incarceration – "a stable job," "a loving wife and a young family," but "that wasn't enough" for him and he was compelled to "terrorize" "30 people." (Dkt. 66 at 6-7.) This Court's concerns then, that given Defendant's "background," "actions," and "choices," he would continue to hurt people unless incarcerated for a lengthy period of time, (Dkt. 66 at 8.), are equally valid today. Defendant remains a danger to the community and should be detained.

The COVID-19 pandemic does not reduce Defendant's danger to others.

The danger posed to the community by firearms offenses has been well-established. *See United States v. Daychild*, 357 F.3d 1082, 1100 (9th Cir. 2004) (approving detention on danger prong due to defendant's possession of firearms and stating that "danger posed to the public by armed conspirators who traffic in illicit drugs is too plain to permit dispute."); *see also United States v. Torres*, 911 F.3d 1253, 1264 (9th Cir. 2019) (Congress passed Section 922(g) to "disarm groups whose members Congress believes are unable or unwilling to conduct themselves in conformity with the responsibilities of citizenship" (internal quotation marks omitted)).

"COVID-19 presents real risks, but so does allowing violent gang members and child predators to roam free." Att'y Gen. Memo. at 1 (Apr. 6, 2020) (memo available online at https://www.justice.gov/coronavirus).

Not only does Defendant present a danger to the community, but the community itself is more vulnerable to such danger given the COVID-19 pandemic. For example, people are at higher risk of violent robberies because they are home rather than out of home. There is less foot traffic in the streets, making those who do have to leave home more vulnerable, as criminals can prey upon them with less concern than normal that a bystander will observe or intervene. And because first responders are focused on mitigating the effects of the COVID-19 outbreak, they are less equipped to prevent and respond to wrongdoing. Indeed, as a district court in Maryland recently observed, installation of location-monitoring tools now poses a risk to United States Pretrial Services officers "given the current recommendations regarding implementation of social distancing." *United States v. Martin*, 2020 WL 1274857 (D. Md. Mar. 17, 2020).

In the current climate, irresponsible social habits can also endanger the health of the community. *Hir*, 517 F.3d at 1088 (holding that "community," within the meaning of 18 U.S.C. § 3142, is not necessarily confined to local geography). The entire state of California is currently ordered to "heed the current State public health directives" to avoid the spread of COVID-19. California Executive Order N-60-20, available at https://www.gov.ca.gov/wp-content/uploads/2020/05/5.4.20-EO-N-60-20.pdf (issued May 4, 2020). Such rules, though enforced by peace officers, rely largely on voluntary compliance. A person who ignores such admonitions and rules could increase infection rates, leading to severe illness

and death.  Defendant has shown an unwillingness or inability to follow rules in the past, and a disregard for the welfare of others.  His failure to follow rules poses particular dangers to the community. Releasing Defendant from his detention, and adding him back into the general population, is antithetical to the concept of sheltering-in-place.

Defendant has not shown that his current medical condition or risk of COVID-19 (a risk that applies in the community as well) makes him less of a danger.  The defense presents no additional facts that meaningfully shift the balance of the § 3142(g) factors in Defendant's favor.

In sum, Defendant has failed to demonstrate that the § 3142(g) factors the Court considered at the time of detention have changed, and thus the Court should deny Defendant's motion for immediate release.

## D.    Section 3553(a) factors weigh against his release

Finally, any compassionate-release decision—even for a statutorily eligible defendant—must also consider the factors under 18 U.S.C. § 3553(a).  *See* 18 U.S.C. § 3582(c)(1)(A)(i); *see also United States v. Shayota*, No. 15-CR-00264-LHK-1, Dkt. 780 (N.D. Cal. May 26, 2020) (denying compassionate release for defendant who served less than 6% of his custodial sentence based on analysis of Section 3553(a) factors); *United States v. Furaha*, No. 09-CR-00742-JST-1, Dkt. 36 (N.D. Cal. May 8, 2020) (denying compassionate release for defendant who served roughly 20% of his sentence based on analysis of Section 3553(a) factors).  The Third Circuit has specifically held that length of time remaining on a defendant's sentence is an appropriate consideration for determining whether to reduce a sentence under 18 U.S.C. § 3582(c)(1)(A).  *United States v. Pawlowski*, 967 F.3d 327, 330–31 (3d Cir. 2020); *see also United States v. Chambliss*, 948 F.3d 691, 693–94 (5th Cir. 2020) (holding the district court did not abuse its discretion in holding the § 3553(a) factors did not warrant release where defendant had served less than half his sentence, even though the defendant's medical condition qualified as an extraordinary and compelling circumstance).

Section 3553(a) factors—which this Court already considered when imposing Defendant's sentence—do not support his request for premature, permanent release.  The law, and the specific facts of defendant's case, neither demand nor endorse that result.  This Court previously rejected Defendant's request for a 96-month sentence as a "non-starter" given "the amount of violence that is affiliated with

this individual." (Dkt. 66 at 5.) While this Court was initially inclined to impose an above-Guidelines sentence, this Court imposed a mid-range sentence after considering the 3553(a) factors including his family support (*Id.* at 5-6, 15-16.)

Granting Defendant's motion under 18 U.S.C. § 3582(c)(1)(A) would undermine these factors, resulting in an effective sentence of just 84 months, far below the applicable Guideline range; even lower than the sentence this Court previously rejected.

Defendant has served a mere 40% of his sentence. The government submits that releasing Defendant outright would not appropriately re-balance the § 3553(a) factors of this case, particularly given that the present conditions caused by the pandemic are likely impermanent—public reporting indicates that various medical professionals globally are in the process of developing a vaccine and researching other methods of combatting the disease in the coming months. *See, e.g.*, https://www.nih.gov/news-events/news-releases/nih-clinical-trial-investigational-vaccine-covid-19-begins.

## III. IF THIS COURT MODIFIES DEFENDANT'S SENTENCE, IT SHOULD DO SO WITH APPROPRIATELY RESTRICTIVE CONDITIONS

If the Court is inclined to grant Defendant's motion for compassionate release, this Court should reduce Defendant's sentence to time served but substitute a term of probation or supervised release with a condition of home confinement for the duration of Defendant's current sentence of imprisonment (until January 23, 2029), to be followed by the term of supervised release with conditions as ordered by the Court at Defendant's original sentencing hearing. The Sixth Circuit recently noted that, while § 3582(c)(1)(A) does not authorize district courts to order defendants to serve their current sentences on home confinement, "if the district court reduces a defendant's sentence under § 3582(c)(1)(A) to time served, it can impose a term of supervised release equal to the unserved time and order, as a condition of that supervised release, that the defendant be confined to his home." *United States v. Spencer*, __ F. App'x __, No. 20-3721, 2020 WL 5498932, at *2 (6th Cir. Sept. 2, 2020) (citing 18 U.S.C. § 3853(d); USSG § 5F1.2). "Thus, with a few extra steps, a district court can craft a reduced sentence that, for all practical purposes, looks very much like ordering that the defendant be allowed to spend the remainder of his current sentence on home confinement." *Id.* (internal quotation omitted). But the

appellate court cautioned that a district court may do so "only if it finds that the defendant meets the criteria set forth in § 3582(c)(1)(A) and USSG § 1B1.13." *Id.*

In order to minimize risks to public health, the government also respectfully requests that the Court (1) order any release only after Defendant's release and travel plans are in place, and (2) set any release 14 days from the date of its order to accommodate BOP's ability to quarantine Defendant prior to his release to protect the community from potential further spread.

## CONCLUSION

Defendant is a danger to others. He has not presented evidence of a serious medical condition that substantially impairs his ability to provide self-care or any other extraordinary or compelling reason to warrant a reduced sentence. This Court should therefore deny Defendant's motion for immediate release under 18 U.S.C. § 3582(c)(1)(A)(i).

DATED: January 29, 2021                           Respectfully submitted,

DAVID L. ANDERSON
United States Attorney

_____/s/_____
SARAH E. GRISWOLD
Assistant United States Attorney